IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

IRON WORKERS LOCAL 16          )
PENSION FUND,                  )
                               )
          Plaintiff,           )
                               )
v.                             )       CIVIL ACTION NO. 1:05-735
                               )
HILB ROGAL & HOBBS CO.,        )
ANDREW L. ROGAL, MARTIN L.     )
VAUGHAN, III, CAROLYN JONES,   )
and ROBERT B. LOCKHART,        )
                               )
          Defendants.          )

**MEMORANDUM ORDER**

THIS MATTER is before the Court on Defendants' Hilb Rogal & Hobbs Co. ("HRH"), Andrew L. Rogal ("Rogal"), Martin L. Vaughan, III, ("Vaughan"), Carolyn Jones ("Jones"), and Robert B. Lockhart ("Lockhart") Motion to Dismiss Plaintiff Iron Workers Local 16 Pension Fund's First Amended Complaint. This case is a federal securities fraud class action filed on behalf of all persons and entities who purchased or acquired HRH securities between August 11, 2000, and May 26, 2005 (the "Class Period"). This securities fraud class action arises from a series of alleged statements and omissions by HRH that allegedly hid HRH's significant reliance on non-standard commissions in reporting its revenue and earnings. The issues before the Court are whether Plaintiff's First Amended Complaint states a federal securities fraud claim, alleging that Defendants misled investors by omitting statements showing HRH's significant reliance on non-standard commissions in reporting its

revenue and earnings and whether the Court should grant Plaintiff leave to amend its Complaint where Plaintiff has already had two full opportunities to state a claim.

The Court holds that the Plaintiff's securities fraud and control person liability claims must be dismissed because: (1) Plaintiff fails to plead that Defendants made a material misstatement or omission; (2) the Complaint fails to raise a strong inference that Defendants acted intentionally, consciously, or recklessly; and (3) without facts to support Plaintiff's claims of securities fraud, Defendants cannot be held liable based upon control person liability. Additionally, the Court dismisses Plaintiff's First Amended Complaint with prejudice because Plaintiff has already had two full opportunities to state a claim and failed to do so.

## I. BACKGROUND

This is a securities fraud case. Plaintiff Iron Workers Local 16 Pension Funds, and the remaining members of the class action, are all persons and entities who purchased, or otherwise acquired HRH securities, during the Class Period. (Compl. ¶ 5.)[1] HRH is an insurance intermediary firm based in Glen Allen, Virginia. (Compl. ¶ 29.) HRH serves as an intermediary between businesses seeking to purchase insurance and insurance companies

---

[1] For the purposes of this opinion the record citation "Compl." refers to Plaintiff's First Amended Complaint, which was filed on October 24, 2005.

seeking to sell insurance.  (Def.'s Br. in Support of Mot. to Dismiss Amend. Compl. ("Def.'s Br."), at 3.)  HRH is publicly traded on the New York Stock Exchange.  (Compl. ¶ 29.) Defendants Rogal, Vaughan, Jones, and Lockhart (collectively "Individual Defendants") were officers and directors of HRH during the Class Period.

This securities fraud class action arises from a series of alleged statements and omissions by HRH that Plaintiff claims wrongfully hid HRH's significant reliance on non-standard commissions[2] in reporting its revenue and earnings.  Plaintiff alleges that Defendants were engaged in a long running scheme to raise HRH's stock price by inflating revenue and earnings through "careful[ly] conceal[ing] illicit[] steering agreements."[3] (Pl.'s Br. in Support of Opp. to Mot. to Dismiss ("Pl.'s Br."), at 1.)  More specifically, Plaintiff claims that HRH failed to disclose:

---

[2] Non-standard commissions are those commissions not based on the sale of any particular insurance policy.  Instead, they are based on the aggregate business placed by an intermediary with a particular insurer.  Depending on the profit or overall volume of businesses placed with the insurer by the intermediary, the insurer pays a commission to the intermediary above and beyond any standard commission paid on a particular policy.  (Def.'s Br., at 4.)  Non-standard commissions are commonly referred to as "contingent" or "override commissions."  (*Id.* at 3.)

[3] "Steering Agreements" are agreements where an intermediary steers consumers to a select number of insurers in return for substantial contingent and /or override commission payments.  In this Order the term "steering agreements" is interchangeable with "override agreements."

(a) that non-standard commissions received from insurance carriers represented an important revenue source and generated nearly forty (40) percent of HRH's net income (Pl.'s Br., at 1-2.);

(b) the true nature of its Carrier Consolidation Initiative (Pl.'s Br., at 1-2.); and

(c) the significant risks that the material portion of its revenue generated by non-standard commissions was subject to fines, penalties, claims for restitution, and damages. (Pl.'s Br., at 1-2.)

HRH's Disclosure of Revenue Derived From Non-Standard Commissions

Non-standard commissions have been regularly used in the insurance industry. (Def.'s Br., at 4.) During the Class Period, HRH received non-standard commissions. Instead of reporting the revenues derived from its non-standard commissions separately on its financial statements, HRH reported the combined total of non-standard and standard commissions. HRH made no distinction concerning what amount or percentage was attributable to non-standard commissions.

New York Attorney General Investigation

In October 2004, the New York Attorney General's Office ("NYAG") made public its investigation of Marsh & McLennan Companies ("Marsh"), an HRH competitor.  The NYAG's investigation focused upon the impropriety of the New York insurance industry's practices of receiving non-standard commissions.  (Compl. ¶ 23.) Plaintiff alleges that on October 14, 2004, Marsh implicated other insurance brokers which caused HRH's stock to fall by 9.5% because investors in the market believed that HRH was engaged in similar improper behavior.  (*Id.*)

On October 27, 2004, Defendants maintained that HRH was not engaged in practices comparable to Marsh and allegedly stated that it was not engaged in special arrangements or bid-rigging. (Compl. ¶ 24.)  However, on May 26, 2005, HRH disclosed that it had received improper payments in connection with the placement of insurance policies and had terminated Defendant Lockhart as a result.[4]  (Compl. ¶ 26.)

---

[4] HRH announced that it had discovered that "beginning in 1998, an employee in the Company's Hartford, Connecticut, office arranged or attempted to arrange for payments to be made . . . in connection with the placement of professional liability insurance policies for three different organizations, which may have been improper."  (Def.'s Ex. 14, HRH Form 8K, at 2 (May 26, 2005).)  Additionally, HRH "terminated the employee who was involved with the three accounts" and announced that Defendant Lockhart, who had served as "president of the Hartford Office . . . at the time of certain . . . payments," had resigned from the Company.  *Id.*

<u>Settlement of Connecticut State Attorney General's Investigation</u>

On August 31, 2005, HRH settled a claim with the Connecticut State Attorney General ("CTAG"), resolving allegations that HRH violated Connecticut's Unfair Trade Practices and Unfair Competition Acts by failing to disclose certain commissions to consumers when they purchased their insurance policies.  (Def.'s Br., at 7.)  The CTAG did not allege that HRH failed to disclose commission arrangements to HRH investors, and CTAG did not assert any claims under securities laws.  (Def.'s Br., at 7.)  The settlement required HRH to establish a restitution fund for certain consumers and to adopt certain business reforms. However, the settlement allowed HRH "to continue collecting contingent commissions on agency business." (Compl. ¶ 175.)

## II. DISCUSSION

### A.  Standard of Review

1.  *FED. R. CIV. P. 12(b)(6) – Failure to State a Claim Upon Which Relief May be Granted*

A Rule 12(b)(6) motion should not be granted unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief. FED. R. CIV. P. 12(b)(6); *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  When considering a motion to dismiss for failure to state a claim upon which relief can be granted, a court must construe the complaint in the light most favorable to the

plaintiffs, read the complaint as a whole, and take the facts asserted therein as true. *See In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 627 (E.D. Va. 2000). However, a court is not limited to the four corners of the complaint. A court may consider any document that is explicitly relied upon in the complaint. *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d 1410 (3d Cir. 1997); *Gasner v. County of Dinwiddie*, 162 F.R.D. 280 (E.D. Va. 1995).

All reasonable inferences must be made in favor of the nonmoving party. *See In re Microstrategy*, 115 F. Supp. 2d at 627 (citing *Republican Party of N.C. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)). A motion to dismiss tests only "the sufficiency of the complaint and, most importantly, does not resolve contests surrounding the facts, the merits of the claim, or the applicability of defenses." *Id*.

2. *Section 10(b) of the Securities Exchange Act of 1934 & Federal Rule of Civil Procedure 9(b)*

To establish liability under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) (2000), and under Rule 10b-5, 17 C.F.R. § 240.10b-5, a plaintiff must allege "(1) a material misrepresentation (or omission); (2) scienter, . . . (3) a connection with the purchase or sale of a security; (4) reliance, often referred to in cases involving public securities markets (fraud-on-the-market cases) as

7

'transaction causation[;]' (5) economic loss; and (6) . . . a causal connection between the material misrepresentation and the loss[.]" *Dura Pharmaceuticals, Inc. v. Broudo,* 125 S. Ct. 1627, 1631 (2005); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 613 (4th Cir. 1999) (holding that to allege securities fraud in the Fourth Circuit, a plaintiff must allege that "(1) in connection with a purchase or sale of securities, (2) the defendant made a false statement or omission of material fact (3) with scienter (4) upon which the plaintiff justifiably relied (5) that proximately caused the plaintiff damages."). *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5.

When proceeding under a fraud on the market theory, a plaintiff need not plead direct reliance or that the fraudulent practice was in connection with a particular sale or purchase of securities. Instead, the plaintiff need only show the means of dissemination and the materiality of the misrepresentation. *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968); *Miller v. Asensio*, 101 F. Supp. 2d 395 (D.S.C. 2000).

In addition to meeting the requirements under Section 10(b), a plaintiff must also meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure that "the circumstance constituting fraud . . . be stated with particularity" in the complaint. FED. R. CIV. P. 9(b). Rule 9(b) provides the standard for pleading a fraud case; furthermore, Congress has codified the pleading standard that a plaintiff must meet in a securities

fraud action in order to survive a 12(b)(6) motion to dismiss – the Private Securities Litigation Reform Act.

**The Private Securities Litigation Reform Act (the "PSLRA" or "Reform Act")**

The PSLRA codifies the requirements of Rule 9(b) and further requires that the complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omissions is made on information and belief, . . . state with particularity all the facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1) (2000). In order to meet this requirement, the complaint must contain the time, place, speaker, and contents of the allegedly false statement. *Glaser v. Enzo Biochem, Inc.*, 303 F. Supp. 2d 724, 734 (E.D. Va. 2003), *aff'd in part and rev'd in part on other grounds,* 126 F.App'x. 593, 601 (4th Cir. 2005); *Borow v. nView Corp.,* 829 F. Supp. 828, 833 (E.D. Va. 1993); *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 535 (3d Cir. 1999) (finding that as to scienter, plaintiffs are required to plead who, what, when, where, and how). Additionally, unlike Rule 9(b), which permits scienter to be averred generally, the PSLRA requires that the complaint in a securities fraud case "state with particularity facts giving rise to a *strong inference* that defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). A complaint that fails to comply with these requirements must be dismissed on a defendant's

motion.   *See* 15 U.S.C. § 78u-4(b)(3)(A).

The Fourth Circuit has chosen not to focus the scienter inquiry on categories of facts such as motive and opportunity. *See Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338 (4th Cir. 2003).  Rather, courts must conduct a case-specific analysis examining all of the allegations in each case in order to determine whether they collectively establish a strong inference of scienter.  *Id.* at 345-46.  The Court in *In re Microstrategy,* concluded that in reviewing whether a plaintiff has pled a "strong inference" that the defendant acted with the requisite state of mind, a court must (1) take the factual allegations in the complaint as true, (2) draw whatever inferences regarding the defendant's state of mind are supported by the these allegations, and (3) determine whether these inferences, individually or cumulatively, provide a strong – or persuasive and cogent – inference that the defendant possessed the requisite state of mind.  *In re Microstrategy,* 115 F. Supp. 2d at 631.  While the existence of particular facts demonstrating motive and opportunity to commit fraud may be relevant to the scienter inquiry, the weight accorded to those facts depends upon the circumstances of each case.  *Ottmann*, 353 F.3d at 345-46. Accordingly, the totality of the circumstances alleged must demonstrate a strong inference of the requisite state of mind. *In re Microstrategy,* 115 F. Supp. 2d at 628.

The Fourth Circuit has held that a plaintiff may allege the required state of mind, or scienter, for securities fraud liability by pleading intentional misconduct or recklessness. *See Ottmann,* 353 F.3d at 344; *Phillips*, 190 F.3d at 620. Intentional misconduct encompasses deliberate illegal behavior. *See City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1260 (10th Cir. 2001). Recklessness is a slightly lesser species of intentional misconduct and must be based on "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Phillips*, 190 F.3d at 621; *Ottmann*, 353 F.3d 343-44; *See also In re Microstrategy*, 115 F. Supp. 2d at 633; *Arnlund v. Deloitte & Touche, LLP*, 199 F. Supp. 2d 461, 474 (E.D. Va. 2002).


## B. Analysis

The Court holds that Plaintiff's securities fraud and control person liability claims must be dismissed because: (1) Plaintiff fails to plead that Defendants made a material misstatement or omission; (2) the Complaint fails to raise a strong inference that Defendants acted intentionally, consciously, or recklessly; and (3) without facts to support Plaintiff's claims of securities fraud, Defendants cannot be held liable based upon control person liability. *See Longman v. Food*

*Lion, Inc.,* 197 F.3d 675, 686 (4th Cir. 1999).

Additionally, the Court dismisses Plaintiff's First Amended Complaint with prejudice because Plaintiff has already had two full opportunities to state a claim and failed to do so.

## 1. Statement-by-Statement Analysis

Courts have employed a statement-by-statement analysis in evaluating whether the complaint "specif[ies] each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omissions is made on information and belief, . . . state with particularity all the facts on which that belief is formed." 15 U.S.C. § 78u-4(b); *see also Arnlund v. Smith*, 210 F. Supp. 2d 755, 762-63 (E.D. Va. 2002); *In re The First Union Corp. Sec. Litig.*, 128 F. Supp. 2d 871, 889 (W.D.N.C. 2001). The complaint must plead with particularity the time, place, speaker, and contents of the allegedly false statements. *Borow*, 829 F. Supp. at 833.

Rule 9(b) requires that allegations of fraud be pled with specificity. Fᴇᴅ. R. Cɪᴠ. P. 9(b). Along these lines, plaintiffs must plead specific facts concerning, for example, when each defendant or other corporate officer learned that a statement was false, how that defendant learned that the statement was false, and the particular document or other source of information from which the defendant came to know that the statement was false. *In re First Union Corp. Sec. Litig.*, 128 F.

Supp. 2d at 886.  Grouping defendants together in a pleading
fails to satisfy the requirement that the who, what, when, where,
why, and how, be pled with specificity.  *Glaser* 303 F. Supp. 2d
at 734 ("[A] complaint alleging fraud may not group the
defendants together: Rule 9(b) requires that allegations of fraud
need to be pled with specificity."); *see also Juntti v.
Prudential-Bache Securities, Inc.*, Civ. No. 92-2066, 1993 WL
138523, *2 (4th Cir. 1993) (unpublished) ("[I]ndicative of the
insufficiently particular character of [a] complaint is its
impermissible aggregation of defendants without specifically
alleging which defendant was responsible for which act.").

Additionally, actionable false or misleading statements must
also be material.  *See First Union,* 128 F. Supp. 2d at 884; *Raab
v. General Physics Corp.*, 4 F.3d 286, 290 (4th Cir. 1993)
(finding optimistic predictions about events that may occur in
the future inactionable and immaterial as a matter of law).  A
fact is material "if there is a substantial likelihood that a
reasonable [investor] (1) would consider the fact important in
deciding whether to buy or sell the security or (2) would have
viewed the total mix of information made available to be
significantly altered by disclosure of the fact." *Longman v.
Food Lion, Inc.*, 197 F.3d 675, 682-83 (4th Cir. 1999).  However,
the determination of materiality is a mixed question of law and
fact; and the standard for a motion to dismiss is whether "no
reasonable juror could determine that the alleged statements

would have assumed actual significance in the deliberations of the reasonable investor." *In re Microstrategy*, 115 F. Supp. 2d at 657 (quoting *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999)).  Furthermore, under the Reform Act, when statements are forward-looking, they are not actionable at all, even if material, when they are accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ.  15 U.S.C. § 78u-5(c)(1).

####    a.  Defendants' Alleged Failure to Disclose their Big Three Strategic Alliances

The Court finds that Plaintiff fails to plead an actionable omission - that Defendants failed to disclose their "Big Three" strategic alliances - for two reasons.  First, Plaintiff fails to plead an actionable omission because the information was available to investors through analyst reports.  Second, Plaintiff fails to plead an actionable omission because Plaintiff fails to show that Defendants had a duty to disclose the "Big Three" strategic alliances.  The Complaint alleges that the "Big Three" agreements were contracts between HRH and three insurers, which provided that "in exchange for . . . contingent or override commissions, HRH would steer a high volume of profitable business" to those insurers.  (Compl. ¶ 13.)  The Complaint further alleges that this omission  rendered all of the Company's statements during the Class Period false or misleading.  (Compl. ¶ 137.)

**i.    Information Regarding the "Big Three" Strategic Alliances was Available to Investors through Public Analyst Reports.**

The Court finds that Plaintiff fails to plead an actionable omission - that Defendants failed to disclose their "Big Three" strategic alliances - because the information was publicly available to investors through analyst reports.  Plaintiff claims that HRH had a duty to disclose non-standard commission as a line item so that investors would know that non-standard commissions were a substantial revenue stream.  (Compl. ¶¶ 14, 19, 21.) Instead, Plaintiff alleges, that HRH failed to disclose the "Big Three" agreements because HRH wanted to secretly "limit competition by steering a select number of insurers in return for substantial contingent and/or override commission payments." (Compl. ¶¶ 10, 13.)  Plaintiff alleges that the revenue earned from the "Big Three" agreements "resulted in high margin revenues [that] required little cost and were high in profit."  (Compl. ¶ 15.)  Plaintiff alleges that this business practice created tremendous risk and liability for HRH and was in violation of state and federal antitrust laws.  (Compl. ¶ 18.)

Securities laws "require disclosure of information that is not otherwise in the public domain, not information that has already been publicly – indeed, officially – disclosed . . . ." *Hillson Partners Ltd. v. Adage, Inc.*, 42 F.3d 204, 212 (4th Cir. 1994).  Where information about a company was made available in an analyst report, or by newspaper articles, any withholding of

15

information by the company is immaterial and **cured any omissions by the company**. *See Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1262-63 (4th Cir. 1993) (emphasis added); *see also Smith v. Circuit City Stores, Inc.,* 286 F. Supp. 2d 707, 721 (E.D. Va. 2003) (holding that where a company failed to mention an allegedly secret in-house finance operation, but the finance operation was available in an analyst report, the company's omission was immaterial); *Raab v. Gen. Physics Corp.,* 4 F.3d 286, 289 (4th Cir. 1993) (stating that press release information available to the market may be considered in analyzing a complaint based on a fraud on the market theory).

Here, as early as 1999, there existed publicly available analyst reports explaining HRH's strategy to consolidate its business with fewer insurance carriers.  (Def.'s Ex. 19, Analyst Report by Hugo J. Warns, III, *Initiating Coverage of HRH*, Legg Mason (May 4, 1999), at 2 (reporting that HRH was focusing on "placing business with fewer insurance carriers and intend[ed] to solidify relationships with several companies" in order to "expand[] product offerings for clients and more favorable contingency and commission terms").)  Additionally, there were several other reports that announced HRH's strategy.  (Def.'s Ex. 20, Analyst Report by Hugo K. Warns, III, *Gloves Off, Ready to Rumble,* Legg Mason (Sept. 22, 1999), at 3 (reporting that HRH's "[m]argin improvement" would be driven by its "consolidation of insurance carrier relationships").); (Def.'s Ex. 21, Analyst

16

Report by Stephens Inc., *Research Bulletin - HRH* (Feb. 17, 2000), at 1 (referring to "steady margin improvement" from a combination of factors, including "consolidation of carrier relationships").); (Def.'s Ex. 22, Analyst Report by Hugo Warns, III, *HRH Reports Solid 4Q99 Results*, Legg Mason (Feb. 18, 2000), at 2 (reporting HRH's efforts to "harvest the overrides associated with consolidating business with fewer carriers").) The Court finds that because this information was available to Plaintiff during the Class Period, it cures any potential omissions by HRH.  Plaintiff argues that any press releases about Defendants' plans to consolidate insurance carriers did not inform the industry because those reports provided insufficient information.  (Pl.'s Br., at 13.)  The Court disagrees because the plain language of the analyst reports refers to, and explains, HRH's efforts to consolidate its insurance carriers in order to obtain favorable steering agreements.

Plaintiff further argues that the Court should not consider the industry analyst reports announcing Defendants' insurance carrier consolidation efforts because those matters are not alleged on the face of the complaint.  (Pl.'s Br., at 13.) Plaintiff maintains that "[l]ooking beyond the amended complaint to find Plaintiff's reliance on [analyst] reports . . . is not proper on a motion to dismiss." (*Id.* at 14.)  The Court finds that it is proper to consider the analyst reports in considering this Motion to Dismiss because it is integral to the Complaint.

In securities fraud actions, the Court will consider the facts stated in the complaint, as well as the documents referred to in the complaint and relied upon by the plaintiff bringing the action. *Phillips*, 190 F.3d at 618.  The Court may also consider material that is otherwise integral to the complaint. *In re PEC Solutions, Inc. Sec. Litig,* No. 03-331, 2004 WL 1854202 at \*2 (E.D. Va. May 25, 2004) (unpublished), *aff'd*, 418 F.3d 379 (4th Cir. 2003); *see also Keeney v. Larkin,* 306 F. Supp. 2d 522, 532 (D. Md. 2003).  Moreover, considering analyst reports is appropriate here because Plaintiff clearly bases its allegations on a review of press releases, media reports, and general investor knowledge. *See Merzin v. Provident Fin. Group, Inc.,* 311 F. Supp. 2d 674, 676 n.1 (S.D. Ohio 2004) (rejecting a plaintiff's claim that the court should not consider press releases attached to a motion to dismiss in that the press releases were outside the scope of the pleadings because it was clear that the plaintiff based "its allegations on 'a review of . . . press releases, and media reports'").

Additionally, considering analyst reports is appropriate here because Plaintiff's claim is based on the fraud on the market theory.  In securities actions asserting fraud on the market claims, courts "examine the . . . information that was publicly available to reasonable investors at the time the defendant made [the allegedly false] statements." *Arnlund,* 210 F. Supp. 2d at 760 (quoting *Gasner,* 162 F.R.D. at 282).  The

fraud on the market theory can cut both ways for a plaintiff because it not only includes information supporting a plaintiff's theory of nondisclosure, but also information from other publicly available sources that may discredit that theory. *Raab,* 4 F.3d at 289. Therefore, it is proper for the Court to consider analyst reports.

The Court finds that Plaintiff fails to plead an actionable omission - that Defendants failed to disclose their "Big Three" strategic alliances - because the information was publicly available to investors through analyst reports.[5]

### ii. Plaintiff Fails to Show that HRH had a Duty to Disclose Information about the "Big Three" Agreements.

The Court finds that even if information about the "Big Three" agreements was not available to investors through analyst reports, Plaintiff fails to plead an actionable omission because Plaintiff fails to show that Defendants had a duty to disclose the information. Under Rule 10b-5, a company has the duty to disclose "when silence would make other statements misleading or false." *Taylor v. First Union Corp.,* 857 F.2d 240, 243-44 (4th Cir. 1988). Generally, there is no duty on the part of the company to provide the public with all material information. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d

---

[5] The Court also notes that, in support of its disclosure of its consolidation of insurance carriers, Defendants issued a press release on June 8, 1999, stating that it had appointed John McGrath as Senior Vice President to oversee HRH's "carrier consolidation efforts." (Def.'s Ex. 24, HRH Press Release (June 8, 1999), at 1.)

Cir. 1997).

Here, Plaintiff has not explained how HRH's alleged silence regarding its consolidation initiative rendered any particular statement false or misleading over the Class Period.  *See Taylor*, 857 F.2d at 244 (finding that defendants had no duty to disclose merger negotiations where the plaintiff "failed to identify any statement made misleading by the defendants' nondisclosure of their merger discussions").  Plaintiff contends that all of HRH's financial statements for a four-year period were false and misleading.  Plaintiff further contends that HRH had a duty to disclose as a line item all non-standard commissions in its financial statements so investors would know that non-standard commissions revenue yielded 38% of revenues.  (Compl. ¶¶ 10-16.) The Court holds that as long as HRH's financial statements accurately disclose financial information about revenues earned, the company has discretion on how to report the revenues, so long as the reporting comports with Generally Accepted Accounting Principles ("GAAP").  The Court could find no GAAP requiring identification of agreements or business affiliations which produce revenue that render HRH's financial statements inaccurate or misleading.   Plaintiff must point to each statement that HRH made over the Class Period that was rendered false or misleading by HRH's alleged silence.  *Taylor*, 857 F.2d at 244.  The Court notes that this requirement for pleading is consistent with the particularity required for security's fraud actions.

However, Plaintiff argues that Defendants had a duty to disclose pursuant to SEC Regulation S-K, all information necessary to have an understanding of HRH's financial condition, a description of what increases in revenue were attributable to, and material contracts. (Pl.'s Br., at 12.)  The Court disagrees for two reasons.  First, there is no private right of action under SEC Regulation S-K.  *Oran v. Stafford*, 226 F.3d 275, 287 (3d Cir. 2000) ("Neither the language of the regulation nor the SEC's interpretive releases construing it suggest that it was intended to establish a private cause of action[], and courts construing the provision have unanimously held that it does not do so.")  Second, because the materiality standards for Rule 10b-5 and Regulation S-K 303 differ significantly, a violation of Regulation S-K does not lead to a failure to disclose under 10b-5.  *Id*. at 228; *see also In re Sofamor Danek Group., Inc.,* 123 F.3d 394, 403 (6th Cir. 1997).  Rather, a separate duty must be shown.  *Oran*, 226 F.3d at 228.  Therefore, the Court finds that even if information about the "Big Three" agreements was not available to investors through analyst reports, Plaintiff fails to plead an actionable omission because Plaintiff fails to show that Defendants had a duty to disclose the information.

<u>b. Defendants' Alleged Failure to Disclose that Non-</u>
<u>Standard Commissions Contributed Materially to HRH's</u>
<u>Revenues</u>

The Court finds that Plaintiff fails to plead an actionable omission - that Defendants failed to disclose that non-standard commissions contributed materially to HRH's revenues - because Defendants disclosed the commission income information in its financial reports.  Securities laws "require disclosure of information that is not otherwise in the public domain, not information that has already been publicly – indeed, officially – disclosed.  *Hillson Partners Ltd.,* 42 F.3d at 212.  Plaintiff alleges that the HRH's failure to itemize non-standard commissions separately from commission income rendered all of HRH's financial statements during the Class Period misleading. (Compl. ¶ 137.)

Here, Defendants argue that HRH repeatedly disclosed that non-standard commissions were an important element of its financial performance:

a.  "[C]ommissions and fees from operations . . . increased 9.3%.  This increase principally reflects new business production, firming of premium levels and **higher non-standard commissions.**"  (Def.'s Ex. 4, HRH Form 10Q, at 12 (May 9, 2002) (emphasis added).)

b.  "Commission income was lower during the second quarter due to **lower contingent commissions,** the majority of which are historically received during the first quarter."  (Def.'s Ex. 5, HRH Form 10Q, at 16 (Aug. 14, 2002) (emphasis added).)

c.  "The increase [in operating margin] reflects **higher non-standard commissions** and the impact of HRH's Best Practices program." (Def.'s Ex. 6, HRH Press Release,

at 1 (Apr. 15, 2003) (emphasis added).)

d.   "The weakness of property and casualty insurance pricing and the **decline in contingent and override commissions** further pressured organic growth, which, in turn, contributed to disappointing financial results." (Def.'s Ex. 7, HRH Press Release, at 1 (July 21, 2004) (emphasis added).)

e.   "Excluding the effect of acquisition and dispositions, commissions and fees decreased 0.2%.  This decrease principally reflects a softening rate environment and **lower contingent and override commissions**."  (Def.'s Ex. 8, HRH Form 10Q, at 9 (Aug. 6, 2004) (emphasis added).)

(Def.'s Br., at 4.)  Plaintiff argues that these statements are insufficient to disclose that non-standard commissions were a significant percentage of revenue because they fail to state specifically that the non-standard commissions "were material, or even a significant . . . element of HRH's financial performance[.]" (Pl.'s Br., at 8; Compl. ¶¶ 21(b), (c), (d), and (e); Compl. ¶ 137.)  The Court disagrees because, even though HRH never affixed the words "material" or "significant," the statements speak for themselves.  The Court will not "attribute to investors a childlike simplicity[,]" and, therefore, the Court finds that these statements disclosed the fact that the non-standard commissions were material.  *Hillson,* 42 F.3d at 213.

The Court finds that Plaintiff fails to plead an actionable omission - that Defendants failed to disclose that non-standard commissions contributed materially to HRH's revenues - because Defendants disclosed the commission income information in its

financial reports.[6]

### c.  Defendants' Alleged Failure to Disclose on a Line Item Basis the Amount of Revenue Attributable to Non-Standard Commissions.

The Court finds that Plaintiff fails to plead an actionable omission - that Defendants failed to disclose on a line item basis the amount of revenue attributable to non-standard commissions - because Plaintiff fails to plead that Defendants had a duty to disclose non-standard commissions on a line item basis.  Courts have recognized that, in dealing with disclosure statements of companies, there are likely to be additional details that could have been disclosed but were not.  *Brody v. Transitional Hospitals Corp.,* 280 F.3d 997, 1006 (9th Cir. 2002). To be actionable under securities law, an omission must be misleading or create an impression of a state of affairs that differs in a material way from the one that actually exists. *Phillips,* 190 F.3d at 613 (holding that to be actionable, an

---

[6] The Court takes judicial notice of the recent decision in *Roth v. Aon Corp.,* et al., Case No. 04 C 6835 (N.D. Ill. Feb. 2, 2006).  On very similar facts stemming from the disclosure of non-standard commissions and steering agreements, the *Roth* court held that it was sufficient for the plaintiff to merely allege that the defendants "'carried out a plan, scheme, and course of conduct which was intended to . . . deceive the investing public . . . regarding [their] financial results and the intrinsic value of [its] publically traded securities'" for Plaintiff to survive a motion to dismiss. *Id.* at 5.  There, the plaintiff adduced several emails, memos, and other documents drafted by the defendants that supported the plaintiff's theory of an overarching scheme to defraud investors.  *Id.*  The court found that those facts, in combination with the internal documents, was sufficient to support a reasonable belief as to the misleading nature of the statement or omission. *Id.* at 6 (citing *Makor Issues & Rights, Ltd. v. Tellabs, Inc.,* 2006 WL 172142, *5 (7th Cir. 2006)).  However, the Court declines to follow the *Roth* court's holding because here the alleged omitted statements were in fact disclosed. Additionally, the *Roth* court opinion did not contain a statement-by-statement review and the opinion does not discuss scienter allegations as required in this jurisdiction.  *See Ottmann*, 353 F.3d at 343-44.

omission must create a "false impression").

Plaintiff argues that Defendants' duty to disclose revenue attributable to non-standard commissions on a line item basis arises from GAAP, SEC Regulation S-K, Staff Accounting Bulletin ("SAB") No. 101 and SEC Interpretive Release No. 34-26831. (Pl.'s Br., at 8.)  The Court has reviewed each of these accounting and disclosure requisites and is unable to find any duty that Defendants had to disclose its non-standard and standard commissions on a line item basis.  Additionally, Plaintiff fails to point to any statement where Defendants stated, or even implied, that non-standard commissions did not contribute to earnings.  Plaintiff does not allege that HRH failed to state the amount of non-standard commission income as a part of stated revenue.  Also, Plaintiff does not allege inflation of non-standard commissions or misrepresentation of the amounts of non-standard commissions.  Absent such allegations, Plaintiff has failed to plead how the alleged omissions were misleading or created an impression of a state of affairs that differed in a material way from the one that actually existed during the Class Period, as required by *Phillips*.  190 F.3d at 613.

Therefore, the Court finds that Plaintiff fails to plead an actionable omission because Plaintiff failed to establish that Defendants had a duty to disclose non-standard commissions on a line item basis.

<u>d. Defendants' Alleged Failure to Disclose that the Receipt of Non-Standard Commissions Was Likely To Cease After "Adequate Disclosure."</u>

The Court finds that Plaintiff fails to plead an actionable omission - that the receipt of non-standard commissions was likely to cease after "adequate disclosure" - for three reasons. First, Plaintiff fails to plead facts supporting its conclusion that adequate disclosure would have put an end to non-standard commissions.  Second, Plaintiff fails to plead that HRH had a duty to disclose that its revenues were unlikely to be sustained or might be discontinued.  Third, to the extent that Complaint paragraph 21(f) is construed as alleging that HRH should have disclosed that its practices were illicit and improper, securities law does not require HRH to accuse itself of wrongdoing.


**i.   Plaintiff fails to plead facts supporting its conclusion that adequate disclosure would have put an end to non-standard commissions.**

The Court finds that Plaintiff fails to plead an actionable omission - that the receipt of non-standard commissions was likely to cease after "adequate disclosure" - because Plaintiff fails to plead facts supporting its conclusion that adequate disclosure would have put an end to non-standard commissions. Plaintiff argues that, because Defendants knew about the likelihood of litigation stemming from their override agreements and the changing regulatory landscape, and in light of the settlement with CTAG, Defendants had a duty to disclose that non-

commissions would cease.   (Pl.'s Br., at 11-12.)   "[P]redictions not 'substantially certain to hold,' like most matters of opinion, simply do not come within the duty of disclosure."   *See In re Sofamor*, 123 F.3d at 402.   Where future opinions regarding future regulatory action "would have proved to be flatly erroneous" there is no duty to disclose.   *See id.* (affirming dismissal where an allegedly omitted opinion regarding future action would have been flatly erroneous).   Here, more than a year after the NYAG began its investigation and several months after HRH settled with CTAG, Defendants, to this day, still collect non-standard commissions.

Therefore, the Court finds that Plaintiff fails to plead an actionable omission - that the receipt of non-standard commissions was likely to cease after "adequate disclosure" - because Plaintiff fails to plead facts supporting its conclusion that adequate disclosure would have put an end to non-standard commissions.

### ii.   **Plaintiff fails to plead that HRH had a duty to disclose that its revenues were unlikely to be sustained or might be discontinued.**

The Court finds that Plaintiff fails to plead an actionable omission - that the receipt of non-standard commissions was likely to cease after "adequate disclosure" - because Plaintiff fails to plead that HRH had a duty to disclose that its revenues were unlikely to be sustained or might be discontinued.

27

The Court finds the ruling in *In re Citigroup* instructive here.  330 F. Supp. 2d 367 (S.D.N.Y. 2004).  There, the plaintiff accused Citigroup of participating in illegal financial schemes with Enron, Dynegy, and other companies.  The plaintiff alleged that Citigroup breached its duty to disclose that its revenues were unsustainable because Citigroup knew that these schemes would "dry up" once discovered.  *Id*. at 378.  The Court reasoned that the plaintiff must point to projections or future predictions in the challenged disclosure documents that were rendered false by the alleged omission to support a claim that a company failed to disclose the potential that the company's revenues might discontinue, or were unlikely to be sustained as the result of a change in the regulatory environment.  *Id.* Plaintiff must point to more than revenue figures implicitly representing to investors that such results would continue.  *Id*. The court held that, because plaintiff failed to cite specific statements in which the defendants guaranteed that revenues would continue, the plaintiff failed to state a claim.  *Id.*; *see also Raab*, 4 F.3d at 289 (holding that "General Physics' accurate reporting of its past results did not . . . require the company to speculate on the effect that a contract slowdown at the [Department of Education] in 1992 would have on its future earnings.").

Here, Plaintiff similarly fails to cite specific statements where HRH guaranteed that revenues would continue.  The general allegation that the reporting of revenues implicitly represented that such results would continue is insufficient.  Therefore, the Court finds that Plaintiff fails to plead an actionable omission - that the receipt of non-standard commissions was likely to cease after "adequate disclosure" - because Plaintiff fails to plead that HRH had a duty to disclose that its revenues were unlikely to be sustained or might be discontinued.

### iii. Securities law does not require HRH to accuse itself of wrongdoing.

The Court finds that Plaintiff fails to plead an actionable omission - that the receipt of non-standard commissions was likely to cease after "adequate disclosure" - because, to the extent that Complaint paragraph 21(f) is construed as alleging that HRH should have disclosed that its practices were illicit and improper, securities law does not require HRH to accuse itself of wrongdoing.  "[F]ederal securities laws do not require a company to accuse itself of wrongdoing."  *In re Citigroup*, 220 F. Supp. 2d at 377; *Weil v. Dominion Res., Inc.,* 875 F. Supp. 331, 337 (E.D. Va. 1994) (reasoning that "securities laws do not obligate defendants to reveal the culpability of their activities").  Additionally, "Rule 10b-5 was not intended to provide shareholders with an avenue for relief against executives for alleged illegal practices or corporate mismanagement . . . ."

29

*Galati v. Commerce Bankcorp, Inc.,* No. 04-3252, 2005 U.S. Dist. LEXIS 26851, *26 (D.N.J. Nov. 7, 2005) (unpublished); *see also Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 479 (1977) (holding that securities laws provide no cause of action for "internal corporate mismanagement"), *quoted in In re Cable & Wireless, PLC Sec. Litig.,* 321 F. Supp. 2d 749, 770 (E.D. Va. 2004). "Defendant's conduct does not establish a Rule 10b-5 violation unless Defendants made a misleading statement in conjunction with the conduct." *Galati,* 2005 U.S. Dist. LEXIS 26851, at *26. Thus, even if HRH's commission practices were improper, Plaintiff has no claim for securities fraud on that basis alone.  Moreover, securities laws do not require that HRH had a duty to disclose illegal and illicit activities.

Therefore, the Court finds that Plaintiff fails to plead an actionable omission - that the receipt of non-standard commissions was likely to cease after "adequate disclosure" - because, to the extent that Complaint paragraph 21(f) is construed as alleging that HRH should have disclosed that its practices were illicit and improper, securities law does not require HRH to accuse itself of wrongdoing.

e.  Defendant's Alleged Failure to Establish a Reserve for Non-Standard Commissions.

The Court finds that Plaintiff fails to plead an actionable omission - that Defendant failed to establish a reserve for non-standard commissions - for two reasons.  First, Plaintiff fails to plead facts indicating when, during the Class Period, there was a reasonable possibility that an additional loss may have been incurred, or when such a loss was probable or reasonably estimable, thus requiring Defendants to establish a reserve. *Smith*, 286 F. Supp. 2d at 718.  Second, even if HRH should have established a reserve, Plaintiff fails to allege the amount that should have been reserved at any particular time during the Class Period.  *California Pub. Employees' Ret. Sys v. Chubb Corp.*, 394 F.3d 126, 152-53 (3d Cir. 2004).


i.  **Plaintiff fails to plead facts indicating when, during the Class Period, there was a reasonable possibility that an additional loss may have been incurred or when such a loss was probable or reasonably estimable.**

The Court finds that Plaintiff fails to plead an actionable omission - that Defendant failed to establish a reserve for non-standard commissions - because Plaintiff fails to plead facts indicating when, during the Class Period, there was a reasonable possibility that an additional loss may have been incurred, or when such a loss was probable or reasonably estimable, therefore requiring the establishment of a loss reserve.  Under GAAP, a company must establish a loss reserve if it is both "probable"

that a liability has been incurred, and if the amount of that liability can be "reasonably estimated." *See* Statement of Financial Accounting Standards ("SFAS") No. 5, Accounting for Contingencies ¶ 8 (Fin. Acct. Stands. Bd., March 1975).  To state a claim, a plaintiff must cite more than the language of the applicable GAAP provision. *PEC Solutions,* 2004 WL 1854202, at *12.  Instead, the plaintiff must support his/her claims with documentation or statements regarding how the company violated the provision. *Id.*

Here, Plaintiff tracks the language of SFAS No. 5 and avers that "HRH's probable liability as a result of its improper conduct was reasonably estimable[.]" (Compl. ¶ 151.)  The Court finds that such conclusory allegations are insufficient under the PSLRA. *See PEC Solutions,* 2004 WL 1854202, at *12;  *see also Smith*, 286 F. Supp. 2d at 718 (dismissing an attack on loss of revenues where a plaintiff "fail[ed] to allege . . . when there was a reasonable possibility that an additional loss may have been incurred or when such a loss was probable and estimable").

Additionally, this Court has held previously that the fact that a plaintiff does not challenge an independent auditor's opinion of financial statements "weakens an allegation that a defendant violated GAAP." *PEC Solutions*, 2004 WL 1854202, at *12.  Here, under the scrutiny of industry regulators, HRH has not restated its earnings during the Class Period and neither the SEC nor any other entity has called for a restatement.  Thus, the Court finds that Plaintiff's allegation that Defendant violated

GAAP is weakened by the fact that Plaintiff did not challenge an independent auditors opinion of HRH's financial statements during the Class Period.

Plaintiff argues, however, that because of the existence of the Connecticut Attorney General settlement during the Class Period, litigation was substantially certain and that Defendants' secretive behavior confirms their awareness of the risks of subsequent litigation.  (Pl.'s Br., at 11-12.)  As such, Defendants should have established a reserve.  The Court finds that such an allegation amounts to fraud by hindsight and is precluded by *Smith.*  286 F. Supp. 2d at 715 (announcing that "[p]leading 'fraud by hindsight,' or Monday morning quarterbacking of this sort, is insufficient pleading under [PSLRA]"); *Hillson Partners Ltd.,* 42 F.3d at 209.

### ii.   Plaintiff fails to allege the amount that should have been reserved at any particular time during the Class Period.

The Court finds that Plaintiff fails to plead an actionable omission - that Defendant failed to establish a reserve for non-standard commissions - because even if HRH should have established a reserve, Plaintiff fails to allege the amount that should have been reserved at any particular time during the Class Period.  A court may dismiss a Complaint for failing to "provide any particulars regarding the amount" at which the reserves should be set.  *California Pub. Employees' Ret. Sys*, 394 F.3d at

153-54.  Plaintiff argues, however, that it need not allege with "numerical specificity" the extent of Defendants' improper accounting practices.  *In re Computer Assocs. Class Action Sec. Litig.*, 75 F. Supp. 2d 68, 73 (E.D.N.Y. 1999) (holding that "[u]nknown specifics, such as the exact amount the earning have been overstated, are not fatal.")   (Pl.'s Br., at 15.)   The Court agrees that Plaintiff need not plead the specific amount at which the reserves should have been maintained at specific points during the Class Period.  Here, however, Plaintiff fails to allege even a general figure for such amounts.  Therefore, the Court finds that Plaintiff fails to plead an actionable omission - that Defendant failed to establish a reserve for non-standard commissions - because even if HRH should have established a reserve, Plaintiff fails to allege the amount that should have been reserved at any particular time during the Class Period.

### f. Defendant's Alleged Failure to Disclose Risks Associated with the Company's Receipt of Non-Standard Commissions.

The Court finds that Plaintiff fails to plead an actionable omission - that HRH failed to disclose risk associated with HRH's receipt of non-standard commissions - for two reasons.  First, HRH disclosed the risk to investors.  Second, even if HRH did not disclose the risk, HRH had no duty to disclose.

### i.  HRH disclosed the risk to investors.

The Court finds that Plaintiff fails to plead an actionable omission - that HRH failed to disclose risks associated with HRH's receipt of non-standard commissions - because HRH disclosed the risk to investors.  Plaintiff accuses HRH of hiding the "material risk" that its "business practices" subjected it to: (1) substantial legal costs, fines, penalties, claims for restitution, and damages" (Compl. ¶¶ 21(k), 137(k)); (2) loss of "customers, reputation, and goodwill" (Compl. ¶¶ 21(j), 137(j)); and (3) "disgorge[ment] [of] all or parts of the commissions to customers which it had improperly obtained during the Class Period" (Compl. ¶¶ 21(I), 137(I)).  However, HRH warned investors twice about the risks associated with their receipt of non-standard commission.  (Def.'s Ex. 3, at 5 (stating that HRH's performance depended on its "continued good standing" with regulators); Def.'s Ex. 9, at 16 (announcing that any decrease in non-standard commissions could cause its financial results to "differ materially").)  Therefore, the Court finds that Plaintiff fails to plead an actionable omission - that HRH failed to disclose risks associated with HRH's receipt of non-standard commissions - because HRH disclosed the risk to investors.

### ii.  HRH had no duty to disclose.

Even if HRH did not disclose the risks associated with their receipt of non-standard commissions the Court finds that Plaintiff fails to plead an actionable omission because HRH had

no duty to disclose such risks.   Under Rule 10b-5, a company has a duty to disclose "when silence would make other statements misleading or false."   *Taylor,* 857 F.2d at 243-44.   Generally, there is no duty on the part of a company to provide the public with all material information.   *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1432 (3d Cir. 1997).   While pending litigation may be material under certain circumstances, the mere possibility of litigation is not material.   *In re Citigroup,* 330 F. Supp. 2d at 377; *City of Philadelphia*, 264 F.3d at 1267.

The Court finds that *In re Citigroup* is again instructive. There, the court found that Citigroup was not required to disclose future litigation because the "[d]efendants' fail[ed] to disclose all possible future litigation is not actionable under section 10(b)."   *In re Citigroup,* 330 F. Supp. 2d at 377-78. Here, Plaintiff pleads no facts suggesting that the risks of litigation, loss of customers, and disgorgement, were substantially certain to occur.   Instead, Plaintiff asks the Court to infer from the recent occurrences in the insurance industry concerning steering agreements and non-standard commissions that HRH must have expected these occurrences would arise during the Class Period.   The Court refuses to make such an inference because mere allegations amounting to fraud by hindsight are insufficient.   *Novak,* 216 F.3d at 309.   Therefore, even if HRH did not disclose the risks associated with their receipt of non-standard commission, the Court finds that

36

Plaintiff fails to plead an actionable omission because HRH had no duty to disclose such risks.

### g. Defendant's Alleged Misrepresentation that HRH Did Not Engage in Practices Comparable to Marsh's Practice.

The Court finds that Plaintiff successfully pleads an actionable misrepresentation - that HRH stated it did not engage in practices comparable to Marsh - because viewed in the light most favorable to the plaintiff, Defendants did make a misrepresentation of a material fact.  Here, Defendants argue that HRH never said that it did not engage in override agreements like Marsh.  Rather, the September 30, 2004, press release cited by Plaintiff states that fifteen (15) percent of HRH's non-standard commissions came from "specially negotiated," volume-based national override agreements.  (Def.'s Br., at 22.) Additionally, Defendants argue that Plaintiff's reliance on a statement by HRH during an analyst conference call, purportedly denying that HRH had "special arrangements" (override agreements) with insurers in the Marsh action, is a misstatement.  Defendants argue that HRH made no such statement but rather stated that HRH had no "special arrangements" with some underwriters in the NYAG suit against Marsh.  (Def.'s Br., at 22.)

The Court finds that analyzing these statements would require the Court to make a factual determination in interpreting their meaning, and thus is inappropriate to consider on a motion to dismiss.  *See In re Microstrategy,* 115 F. Supp. 2d at 627

(citing *Republican Party of N.C.*, 980 F.2d at 952, which announced that a motion to dismiss tests only "the sufficiency of the complaint; importantly, it does not resolve contests surrounding the facts, the merits of the claim, or the applicability of defenses"). However, if viewed in the light most favorable to Plaintiff, the Complaint alleges that Defendant stated that HRH did not engage in similar steering agreements. Therefore, the Court finds that Plaintiff successfully pleads an actionable misrepresentation - that HRH stated it did not engage in practices comparable to Marsh - because viewed in the light most favorable to the plaintiff, Defendants did make a misrepresentation of a material fact.

2.  <u>Scienter</u>

Even if Plaintiff successfully pleads actionable omissions for a securities fraud claim, the Court dismisses the Complaint because Plaintiff fails to plead facts that give rise to a strong inference of scienter for three reasons. First, Plaintiff fails to plead that Individual Defendants had a motive to defraud investors. Second, Plaintiff fails to plead conscious misconduct or recklessness. Third, the Individual Defendants' substantial acquisition of HRH stock during the Class Period negates an inference of scienter.

As noted above, the PSLRA requires plaintiffs to plead "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §

78u-4(b)(2). Mere negligence will not suffice, there must be evidence of scienter. *See Phillips,* 190 F.3d at 621. Scienter "refers to a mental state embracing intent to deceive, manipulate, or defraud." *See Ottmann,* 353 F.3d at 343 (citing *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 n. 12 (1976) and *Malone v. Microdyne Corp.,* 26 F.3d 471, 478 (4th Cir. 1994)). Scienter may also be established by a showing of recklessness. *See Ottmann,* 353 F.3d at 343. Recklessness is defined as "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Id.* at 343-44 (citing *Phillips,* 190 F.3d at 621). In the Fourth Circuit, a plaintiff must plead sufficient facts to demonstrate that the defendants acted with "scienter," *i.e.,* that they "acted intentionally, which may perhaps be shown by recklessness." *Phillips,* 190 F.3d at 620. The PSLRA does not change the standard of proof for scienter that a plaintiff must satisfy at trial. It did, however, heighten the standard for pleading scienter by requiring that the plaintiff allege particular facts that raise a "strong inference" of the requisite state of mind. *Id.*

In support of its claims of scienter, Plaintiff argues that: (1) Defendants (Individual Defendants) were motivated to defraud investors in order to obtain increased individual executive

compensation (Compl. ¶¶ 180-81) and wanted to expand business by
corporate acquisitions (Compl. ¶¶ 183-84); (2) the Individual
Defendants, as corporate executives, had access to unspecified
internal documents (Compl. ¶¶ 186-87); and (3) the Individual
Defendants were aware that the Company had entered into
agreements to receive non-standard commissions. (Compl. ¶¶ 177-
79.)

a.  Motive

The Court finds that Plaintiff fails to plead that the
Individual Defendants had a motive to defraud investors based on
their desire to obtain increased executive compensation and their
desire to expand the business by corporate acquisitions.


i.  **Executive Compensation**

Plaintiff's allegation that the individual officers failed
to disclose information based on their desire to increase their
executive compensation is insufficient to support a strong
inference of scienter.  *In re Tex. Co., Inc. Sec., Litig.,* 212 F.
Supp. 2d 596, 607 (W.D. Va. 2002) (stating that "every corporate
officer wants a bigger bonus").  Allowing a party to plead
scienter by alleging executives were motivated by a financial
incentive program "would effectively eliminate the state of mind
requirement as to all corporate officers." *Melder v. Morris,* 27
F.3d 1097, 1102 (5th Cir. 1994), *cited by Phillips*, 190 F.3d at
622.  Here, Plaintiff alleges that the Individual Defendants were

motivated to defraud investors to obtain increased compensation. (Compl. ¶¶ 180-81.)  The Court finds that this generalized motive, shared by most, if not all, corporate officers, is insufficient to plead scienter.  Therefore, the Court holds that Plaintiff fails to allege Defendants acted with a strong inference of scienter based on a desire for increased executive compensation.

### ii.  Desire to Complete Company Acquisitions

The Court finds that Plaintiff fails to allege a strong inference of scienter based on HRH's desire to expand business by corporate acquisitions because the desire to expand business through corporate acquisitions is insufficient to support a strong inference of scienter.  The Fourth Circuit has rejected generalized motives, which all companies share, as insufficient to plead scienter.  *Ottmann*, 353 F.3d at 352.  Here, Plaintiff alleges that HRH defrauded investors in order to expand business through corporate acquisitions. (Compl. ¶¶ 183-84.)  The Court finds that the expansion of business by corporate acquisitions is a generalized motive, shared by most, if not all, companies, and is thus insufficient to plead scienter.  Therefore, the Court finds that Plaintiff fails to allege a strong inference of scienter based on HRH's desire to expand business through corporate acquisitions.

### b.  Misconduct or Recklessness

The Court finds that Plaintiff fails to plead facts that give rise to conscious misconduct or recklessness by the Individual Defendants based solely on the Individual Defendants' executive positions and Individual Defendants' knowledge of HRH's use of steering agreements.  The Fourth Circuit has held that a plaintiff may allege the required state of mind, or scienter, for securities fraud liability by pleading intentional misconduct or recklessness.  *See Ottmann*, *353 F.3d at 344; Phillips*, 190 F.3d at 620.  Intentional misconduct encompasses deliberate illegal behavior.  *See City of Philadelphia*, 264 F.3d at 1260. Recklessness is a slightly lesser species of intentional misconduct and must be based on "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it."  *Phillips*, 190 F.3d at 621; *Ottmann*, 353 F.3d at 343; *accord In re Microstrategy*, 115 F. Supp. 2d at 633; *Arnlund,* 199 F. Supp. 2d at 474.

### i. Executive Positions

The Court finds that Plaintiff fails to allege a strong inference of scienter based on the Individual Defendants' executive position because holding an executive position alone does not necessarily lead one to infer that Individual Defendants knew that the alleged omissions were false or misleading. Allegations that a defendant must have known that a statement was false and misleading because of his or her position in the company are "precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny." *City of Philadelphia*, 264 F.3d at 1264 (quoting *Advanta*, 180 F.3d at 539) (quoted by *PEC Solutions*, 2004 WL 1854202, at *14). Here, Plaintiff argues that Individual Defendants, by virtue of their corporate position, "had access to internal corporate documents [and] conversations and connections with other corporate officers and employees." (Compl. ¶ 186.) Plaintiff asks the Court to infer that "[b]ecause of their possession of such information, the Individual Defendants knew or recklessly disregarded" the steering agreements and the revenue derived therefrom. (*Id.*) The Court refuses to make such an inference. These allegations are insufficient because the holding of an executive position alone does not lead to an inference that Individual Defendants knew the alleged omissions were false or misleading. *In re MicroStrategy,* 115 F. Supp. at 642-43 ("There is no dispute that allegations pertaining to

43

motivation that are applicable to every corporation or corporate officer cannot, by themselves, raise a strong inference of scienter."); *see also In re Criimi Mae, Inc. Securities Litigation*, 94 F. Supp. 2d 652, 660 (D. Md. 2000) (explaining that allegations that "merely charge that executives aim to prolong the benefits they hold" are, standing alone, insufficient to demonstrate the necessary strong inference of scienter). Therefore, the Court finds that Plaintiff fails to allege a strong inference of scienter based on the Individual Defendants' executive positions.

### ii.   Knowledge of Steering Agreements

The Court finds that Plaintiff fails to allege a strong inference of scienter based on the Individual Defendants' knowledge of HRH's steering agreements.  The relevant inquiry for purposes of pleading scienter in a securities fraud action is whether any Individual Defendant knew that a particular public statement was false or misleading, or that the Company's financial statements where somehow incorrect.  *See In re First Union Corp. Sec. Litig.*, 128 F. Supp. 2d at 886 (reasoning that plaintiffs must plead "specific facts concerning, for example, when each defendant or other corporate officer learned that a statement was false, how that defendant learned that the statement was false, and the particular document or other source of information from which the defendant came to know that the

statement was false").

Here, Plaintiff fails to allege how each Individual
Defendant acted with an intent to deceive investors.  The
Complaint fails to allege that any Individual Defendant believed
or was advised that HRH faced regulatory problems but told
investors otherwise.  *See Nolte v. Capital One Fin. Corp.*, 390
F.3d 311, 316 (4th Cir. 2004) (affirming dismissal where
plaintiff failed to plead that management "believed Capital One
was undercapitalized . . . but then publicly declared that
Capital One was maintaining sufficient capital").  The Complaint
fails to allege that any Defendant received internal loss reserve
reports that included a loss for risks related to non-standard
commissions, but then deleted this loss from financial statements
before releasing them to the public.  *See Shields v. Citytrust
Bancorp., Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (affirming
dismissal where there were no allegations that defendants'
statements of reserves were "inconsistent with [internal] data" -
that they were "incompatible with what the most current
[internal] reserve reports showed at the time the disclosures
were made").  The Complaint fails to allege that Defendant
Vaughan knew in October 2004 that HRH was condoning or engaging
in fraud or bid-rigging.  Therefore, the Court finds that
Plaintiff fails to allege a strong inference of scienter based on
the Individual Defendants' knowledge of HRH's steering agreements
because the Complaint fails to allege whether any Defendant knew
that a particular public statement was false or misleading, or

that the Company's financial statements were somehow incorrect.

### iii. Defendants' Attempt to Keep Sensitive Business Information Confidential

The Court finds that Defendants' attempt to keep sensitive business information confidential does not support a strong inference of scienter.  Plaintiff argues that Defendants' attempt to conceal their use of steering agreements through confidential internal memoranda creates a strong inference of HRH's intent to defraud investors.  (Pl.'s Br., at 18-19.)  Specifically, Plaintiff alleges that Defendant Vaughan admitted in a December 2000 memorandum that he was aware that the cash flow from the steering arrangements and the "Big Three" agreement "went straight to bottom line and [was] a primary driver in [HRH's] financial success" and had been a principal proponent of entering into the agreements within the Company; and Defendant Rogal announced in an internal confidential memorandum that HRH had agreed in principle to the steering agreements with the "Big Three" and was a principal negotiator.  (Compl. ¶¶ 30, 31, 177, 178.)  The Court notes that adopting this argument would mean that anytime a company designates a memorandum confidential, that action would be a strong indicator of an intent to defraud investors.  If this were the case, then every business across our great land would have potential liability.  Instead, the Court finds that Defendants' attempt to keep sensitive business information confidential does not support a strong inference of

scienter.  Cf. *Phillips*, 190 F.3d at 623 (holding that "[b]ecause the stockholders' allegations pertain to motivations common to every corporate merger, those allegations cannot demonstrate scienter").

### iv.  Retirements and Resignations

The Court finds that retirements and resignations are insufficient to show that Defendants acted with the requisite scienter.  Subsequent resignations by executives are insufficient to support a strong inference of scienter.  *See Southland Sec. Corp. v. INSprire Ins. Solutions, Inc.*, 365 F.3d 353, 383 (5th Cir. 2004) (holding that "subsequent resignations of . . . executives is similarly unavailing as proof of the commission of fraud by these or other individuals."); *Stambaugh v. Corrpro Cos., Inc.,* 116 Fed. App'x. 592, at *5 (6th Cir. 2004) (stating that "none of the factual circumstances alleged by [plaintiff] give rise to a strong inference of scienter," including the resignations of five top level executives within an eighteen month period).  Therefore, the Court finds that retirements and resignations are insufficient to show that Defendants acted with the requisite scienter.

### c.  Acquisition of HRH Stock During the Class Period

The Court finds that Individual Defendants' substantial acquisition of HRH stock during the Class Period negates an inference of scienter.  The fact that a defendant acquires stock during a class period further negates any idea that Defendants had a motive to commit fraud.  *PEC,* 2004 WL 1854202, at *16; *see also First Union*, 128 F. Supp. 2d at 899;  *Oppenheimer v. Novell*, Inc. 851 F. Supp. 412, 417 (D. Utah 1994) (holding that where a company initiated a stock buy back program at the same time it was allegedly inflating the value of the stock was against its own economic interests and cut against the inference of fraud on the market).  Here, Individual Defendants purchased a significant amount of HRH stock during the Class Period.  (*See* Def.'s Ex. 36 (showing that the net percentage change in HRH holdings for Individual Defendants during the Class Period are as follows: Vaughan: +126.94; Rogal: +451.79; Jones: +213.65; Lockhart: +500.00).)  Therefore, the Court finds that Individual Defendants' substantial acquisition of HRH stock during the Class Period negates an inference of scienter.


### 3.  Group Pleading in General

The Court dismisses Plaintiff's Complaint because group pleading is insufficient to plead with the particularity required by Rule 9(b).  A complaint must plead with particularity the time, place, speaker, and contents of the allegedly false

statements.  *See also Glaser v. Enzo Biochem, Inc.*, 303 F. Supp. 2d 724, 734 (E.D. Va. 2003), *aff'd in part and rev'd in part on other grounds* 126 F.App'x. 593, 601 (4th Cir. 2005); *see also Borow*, 829 F. Supp. at 833.  A complaint alleging fraud may not group the defendants together: Rule 9(b) requires that allegations of fraud need to be pled with particularity.  FED. R. CIV. P. 9(b); *see also Juntti v. Prudential-Bache Securities, Inc.*, Civ. No. 92-2066, 1993 WL 138523, *2 (4th Cir. 1993) ("[I]ndicative of the insufficiently particular character of [a] complaint is its impermissible aggregation of defendants without specifically alleging which defendant was responsible for which act.").  This specificity requires that "at a minimum" for each alleged misstatement or omission,

> plaintiffs must plead specific facts concerning, for example, when *each* defendant or other corporate officer learned that a statement was false, how *that* defendant learned that the statement was false, and *the particular* document or other source of information from which the defendant came to know that the statement was false.

*In re First Union Corp Sec. Litig.*, 128 F. Supp. 2d at 886 (emphasis added).  Group pleading fails to satisfy the requirement that the who, what, where, why, and when of the fraud be specified.  *See id., see also In re Cree, Inc. Sec. Litig.*, 333 F. Supp. 2d 461, 475 (M.D.N.C. 2004) (holding that while some courts have allowed plaintiffs to utilize group pleading, this practice is inconsistent with the particularity requirements of the PSLRA).  In the Fourth Circuit "[s]uch pleading practice is insufficient . . . . The burden rests on plaintiffs to 'enable a

particular defendant to determine with what it is charged.'" *Id.* (citing *Juntti,* 993 F.2d at 228); *see also Apple v. Prudential-Bache Sec., Inc.*, 820 F. Supp. 984, 987 (W.D.N.C. 1992) ("By using common allegations to imply that each defendant is responsible for the statements and actions of the others, plaintiffs are not in compliance with Rule 9(b), which requires that a complaint set forth with particularity each defendant's culpable conduct.")

Therefore, the Court dismisses Plaintiff's Complaint because group pleading is insufficient to plead with the particularity, as required by Rule 9(b).

4. <u>Leave to Amend</u>

The Court dismisses Plaintiff's Amended Complaint with prejudice because Plaintiff has already had two full opportunities to state a claim and have failed to do so. "A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar . . . ." Fed. R. Civ. P. 15(a). A party requires leave of court to amend a pleading more than once, but such leave "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). Nevertheless, if a proposed amendment is futile, a court should deny leave to amend. *See Edwards v. City of Goldsboro*, 178 F.3d 231, 242 (4th

Cir. 1999) (holding that a motion seeking leave to amend "should be denied only when the amendment would be prejudicial to the opposing party, there has been bad faith on the part of the moving party, or the amendment would be futile").

In the Eastern District of Virginia, an amendment may be considered futile where Plaintiffs have previously had two full opportunities to plead their claim. *Travelers Cas. & Sur. Co. v. Danai*, No. Civ. A. 05-356, 2005 WL 2045398, at *3 (E.D. Va. Aug. 22, 2005) (denying a plaintiff's request to file a Second Amended Complaint because plaintiff "had two full opportunities to plead their claim").

Here, Plaintiff has had two full opportunities to state its claim because it filed this action in this Court and then amended its complaint to the version at issue here.  Therefore, the Court dismisses Plaintiff's Amended Complaint with prejudice because Plaintiff has had already had two full opportunities to state a claim.

## II.   CONCLUSION

The Court holds that the Plaintiff's securities fraud and control person liability claims must be dismissed because: (1) Plaintiff fails to plead that Defendants made a material misstatement or omission; (2) the Complaint fails to raise a strong inference that Defendants acted intentionally, consciously, or recklessly; and (3) without facts to support

Plaintiff's claims of securities fraud, Defendants cannot be held liable based upon control person liability.  Additionally, the Court dismisses Plaintiff's First Amended Complaint with prejudice because Plaintiff has already had two full opportunities to state a claim and failed to do so.

For the foregoing reasons, it is hereby

ORDERED that Defendants' Hilb Rogal & Hobbs, Andrew L. Rogal, Martin L. Vaughan, III, Carolyn Jones, and Robert B. Lockhart, Motion to Dismiss Plaintiff's First Amended Complaint is GRANTED.  It is further

ORDERED that Plaintiff's First Amended Complaint is DISMISSED WITH PREJUDICE.

The Clerk is directed to ENTER JUDGMENT in favor of Defendants Hilb Rogal & Hobbs Co., Andrew L. Rogal, Martin L. Vaughan, III, Carolyn Jones, and Robert B. Lockhart and against Plaintiff Iron Workers Local 16 Pension Fund pursuant to Federal Rule of Civil Procedure 58.

The Clerk is directed to forward a copy of this Order to counsel of record.

ENTERED this __24_ day of April, 2006.


_____/s/_____
Gerald Bruce Lee
United States District Judge

Alexandria, Virginia
04/24/06